INVESTIGATION, RESEARCH AND TESTING

Since 1970

# Line Handling Incident

Your Client: Galliano Marine Services, LLC

Location of Loss: Onboard the M/V LANEY CHOUEST
Port Fourchon, Louisiana

Date of Incident: October 30, 2021

Prepared for:

**Kent Morrison, Esq.**
**Phelps Dunbar, LLP**
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130

## S-E-A Matter No. 07.133570

Issue Date: July 28, 2023

EXHIBIT
7

# Table of Contents

**List of Figures** ..... 3

**Acronyms, Abbreviations and Definitions** ..... 4

**I. Executive Summary** ..... 5

Matter Assignment ..... 5

Scope ..... 5

Methodology ..... 5

Conclusions ..... 5

Signatures ..... 7

**II. Procedures** ..... 8

**III. Discussion** ..... 11

Vessel Details ..... 11

BACKGROUND ..... 12

Analysis ..... 16

Summary ..... 29

Professional Qualifications ..... 30

**Appendices** ..... 31

Investigator Credentials ..... 31

## List of Figures

Figure 1: LANEY CHOUEST, Internet photograph ........................................................................11

Figure 2: LANEY CHOUEST foredeck and windlass. Image from Plaintiff's vessel inspection. .....14

Figure 3: Typical deck mounted (electric) capstan, not vertical configuration (internet photo). .......................................................................................................................................17

Figure 4: Large deck winch with horizontal warping drum (internet photo). ..............................17

Figure 5: Typical and correct use of a mooring line stopper. .......................................................18

## Acronyms, Abbreviations and Definitions

| | |
|---|---|
| JSA | Job Safety Analysis |
| OS | Ordinary Seaman |
| OSV | Oilfield Supply Vessel |
| QMED | Qualified Member of the Engine Department |
| STCW | The International Code for Training and Certification of Watchstanders |
| USCG | United States Coast Guard |

# I. Executive Summary

## Matter Assignment

On June 8, 2023, Carlos Saravia, Esq., of Phelps Dunbar, LLC requested SEA, Ltd. (S-E-A) to evaluate a personal injury claim that occurred onboard the Tug/Supply vessel LANEY CHOUEST while moored in the Port of Fourchon, Louisiana on October 30, 2021. S-E-A was advised by Mr. Saravia that the vessel captain requested assistance from crewmember Layton Price to assist him adjusting the vessel mooring lines. During the procedure, Wiper Price sustained a hand injury and has made a claim against the vessel. This project was assigned to the direction of S-E-A Senior Maritime Consultant Captain Christopher Karentz as S-E-A Matter No. 07.133570.

## Scope

S-E-A evaluated information about the subject incident to determine how this incident occurred. Specifically, S-E-A was requested to offer opinions regarding crew training, procedures for line handling, and personal safety when line handling.

## Methodology

The methodology utilized by S-E-A during the investigation of this incident was in accordance with *The Scientific Method* and applicable principles. The investigation and analysis of any incident is a complex and scientific endeavor. The methodology of such an endeavor, therefore, must include the comprehensive, objective, and accurate compilation and analysis of the available data.

## Conclusions

- **The inherent dangers related to onboard line handling, including mooring lines, are common across all types of vessels.**
- **It is an acceptable practice for LANEY CHOUEST to leave her bow lines on the warping drums.**
- **Wiper Price was a professional seaman with line handling knowledge and experience.**

- The LANEY CHOUEST foredeck arrangement and mooring appurtenances were of an approved design and installation commensurate with the applicable standards and contemporary OSV designs.
- Two persons could have safely performed the tensioning of the LANEY CHOUEST bow lines on October 30, 2021.
- Galliano Marine Services pre-employment training, company safety policies, and onboard procedures are commensurate with industry standards.
- Captain Mathes made a logical presumption that Wiper Price knew how to handle mooring lines.
- As a professional mariner with many years' experiences with different companies, Wiper Price should have understood the concept of risk assessment even if he did not use the correct terminology.
- Regardless of when Wiper Price received his pre-employment training, there was no reason for Captain Mathes to specifically question if Wiper Price had received the company training.
- A Job Safety Analysis and/or Risk Assessment was not specifically necessary for this task
- Non deck department crewmembers on OSV's may sometimes be required to assist with line handling.
- Many of the allegations in this matter are not relevant to the subject incident.
- Galliano Marine Services had the appropriate company procedures, shoreside pre-employment training, and onboard practices that should have prevented the personal injury of Wiper Price.
- The preponderance of fault in this matter lies upon Wiper Price.

## Signatures

S-E-A and the undersigned hereby certify the opinions and conclusions expressed herein were formed to a reasonable degree of professional certainty. They are based upon the application of reliable principles and scientific methodologies to all of the facts known by S-E-A and the undersigned when this report was issued, as well as knowledge, skill, experience, training, and/or education. Should additional information be discovered, S-E-A and the undersigned reserve the right to appropriately amend or augment these findings.

Prepared By:

DocuSigned by:
Christopher Karentz
747D25B68C9D46D...

Captain Christopher Karentz
Senior Maritime Consultant

Technically Reviewed By:

Randy Watson / cel

Randy Watson

CK/cel

## II. Procedures

1. **S-E-A reviewed and evaluated information provided by Phelps Dunbar, LLP related to this matter, which included:**
   - Complaint For Damages Under The Jones Act, etc., Filed December 8, 2021.
   - First Amended Complaint For Damages Under The Jones Act, etc., Filed July 21, 2022.
   - Galliano Marine Services, 15-minute "Goal Zero" video.
   - USCG Form 2692, Report of Marine Casualty, Commercial Diving Casualty, or OCS-Related Casualty, for the LANEY CHOUEST dated October 30, 2021.
   - Galliano Marine Service, Incident Report, OS Layton Price Injury, Report No. 216/2021/018, dated October 20, 2021.
   - Edison Chouest Offshore, "Company Mooring Incidents" four-page document.
   - Edison Chouest Offshore Statement of Record and handwritten Layton Price Statement.
   - Edison Chouest Offshore, 5-Whys Root Cause Analysis Form for subject incident.
   - Edison Chouest Offshore, 2-pages, photograph pages from Incident Report.
   - Engine room rough logbook, October 1 to 22, 2021.
   - Engine room rough logbook, October 22 to 31, 2021.
   - Deck department rough logbook, October 1 to 31, 2021.
   - LANEY CHOUEST Daily Boat Log Report, Month of October 2021.
   - Captain Ronald Wayne Mathes, USCG Merchant Mariner Credentials.
   - Laney Chouest RISK ASSESSMENT, dated July 31, 2021.
   - Laney Chouest RISK ASSESSMENT, dated October 20, 2021 (Layton Price participant).
   - Laney Chouest RISK ASSESSMENT, dated November 1, 2021 (post incident).
   - Layton Price, Certificate of Completion, Line Handling Safety for the Inland Waterways, dated October 5, 2021.
   - Set of 5 training videos about line handling safety.
   - USCG Certificate of Inspection for LANEY CHOUEST, February 27, 2018 to March 2, 2023.
   - Captain Mathes Personnel File and Performance Evaluation.
   - Layton Price Personnel File.

- Edison Chouest Offshore, Performance Evaluations and Competency Assessments, GMS/QHSEMS/3/0227, Revision 05 / 03/03/2021.
- Edison Chouest Offshore, Job Descriptions, GMS/JDONSL/2584, Revision 04 / 06/12/2021.
- Captain Mathes post incident Drug and Alcohol Testing submission and results.
- Layton Price post incident Drug and Alcohol Testing submission and results.
- LANEY CHOUEST Post Incident Toolbox Talk Report Form, Dated November 1, 2021.
- Edison Chouest Offshore, Hiring Policy, GMS/QHSEMES/3/0221, Revision 11 / 04/15/2021.
- Layton Price Merchant Mariner Credential Verification Search Results dated September 28, 2021.
- American Bureau of Shipping, Rolls-Royce Marine AS, Windlass Certification Report No. GD1624236.
- American Bureau of Shipping, Rolls-Royce Marine AS, Windlass Certificate No. GD1624236.
- LANEY CHOUEST United States Coast Guard Certificate of Documentation, Official No. 1132635.
- LANEY CHOUEST United States Coast Guard Certificate of Inspection, Official No. 1132635, issued February 27, 2018 with expiration date March 2, 2023, annual endorsement May 24, 2021.
- LANEY CHOUEST General Arrangement Drawings, 348-foot Anchor Handling Tug Supply Vessel.
- Extracts from Edison Chouest Offshore, Quality, Health, Safety, Environmental Manual.
- Deposition Transcript of Captain Mathes with Exhibits dated September 14, 2022.
- Deposition Transcript of Chief Engineer Fankie Scott Johnson with exhibits, dated February 2, 2023.
- Deposition Transcript of QHSE Coordinator Hal Nini with Exhibits dated September 15, 2022.
- Deposition Transcript of Plaintiff Layton Price, Edison Chouest QMED, dated June 20, 2022.

- Deposition Transcript of Tyva Dubose, Edison Chouest Able Seaman, dated December 6, 2022.
- Deposition Transcript of Bill Pellegrin, Galliano Marine Services corporate representative, dated June 21, 2023.
- 3D Marine USA, Inc. Expert Report by Captain David H. Scruton, dated June 24, 2023.
- Set of five training videos about line handling safety.

2. **S-E-A reviewed and considered relevant industry publications and other materials in the evaluation of this incident, including:**

- LANEY CHOUEST vessel specifications from internet resources (Marine Traffic, Shipspotting and USCG database).
- Google Earth™ imagery of the Port Fourchon OSV facilities.

# III. Discussion

## Vessel Details

LANEY CHOUEST is a contemporary oilfield supply vessel but outfitted for light-duty marine construction work. The vessel has dynamic position capability, large crew capacity, and heavy lift equipment to compliment the large work deck.




**Figure 1: LANEY CHOUEST, Internet photograph.**

| | |
|---|---|
| Name: | LANEY CHOUEST |
| IMO: | 9271690 |
| USCG Documentation: | 1132635 |
| Vessel Type / Service: | Offshore Supply Vessel |
| Trade Indicator: | Coastwise Unrestricted, Registry |
| Flag: | USA |
| Home Port: | Galliano, Louisiana |
| Year Built: | 2003 |
| Owner: | Edison Chouest Offshore |
| Manager: | Galliano Marine Services |
| Builder: | North American Shipbuilding |
| Construction: | Welded Steel |
| Classification Society: | American Bureau of Shipping |

| | |
|---|---|
| Accommodations / crew: | 58 persons |
| Propulsion: | 4 x MAK Diesel Engines (Combined 30,000 horsepower) |
| Tonnage: | 5922 Gross / 1776 Net |
| Deadweight Capacity: | 5712 t |
| Approx Dimensions: | 105m x 22m x 6m (draft) |

## BACKGROUND

This matter concerns a personal injury sustained by Layton Price, a USCG Credentialed Mariner with designation as Qualified Member of the Engine Department (QMED). Wiper Price was employed onboard the Anchor Handling Supply Vessel LANEY CHOUEST as Engine Room Wiper.

LANEY CHOUEST is an OSV owned by Edison Chouest Offshore but managed and operated by Galliano Marine Services, LLC. According to the documents reviewed about this matter, the vessel was not in operational mode at the time of Wiper Price's incident. Specifically, the testimony for this matter describes that vessel machinery was undergoing repair using shoreside contractors and the manning was reduced to a short-staff crew of captain, engineer, wiper, and deckhand. With the vessel "not in navigation," minimum crew were required for basic housekeeping, light maintenance, and security watch. The captain was working the dayshift 0600-1800 hours along with the engineer and QMED. The vessel deckhand was assigned to the evening shift 1200 - 2400 hours. This left the hours between midnight and 0600 hours without anyone on deck, but testimony in this matter described the deck hand would be up and about after midnight before going to sleep and the captain was an early riser thus leaving only a few hours with the vessel crew asleep. This would be customary for a warm stacked vessel and did not compromise the overall safety of the vessel. Acknowledging that safety and security of the vessel are paramount, four crew were an adequate compliment to keep the vessel secure while dockside in Fourchon.

According to the documents reviewed by S-E-A, Wiper Price was an experienced mariner who applied for and was hired by Edison Chouest offshore to work onboard the OSV LANEY CHOUEST. He had been employed in the marine industries aboard fishing vessels and had attended Delgado Community College where he took a course of studies to obtain his <u>USCG Merchant Mariner Credential</u>. In addition to the full course curriculum, he was issued a

certificate for Personal Safety and Social Responsibilities (DELGCC-359), February 12, 2020, Document No. D12020-530. According to the certificate, this training included:

> *Personal Safety & Social Responsibilities competency and training requirements of Section A-VI/1 and Table A-VI/1-4 of the STCW Code, as amended 2010, and 46 CFR 11.302(a)(4) and 12.602(a)(4); AND have performed all assessment tasks as guided by the applicable section within the Basic Training NVIC 08-14.*

Upon his engagement by Edison Chouest Offshore, he attended the pre-requisite company training for 3 or 4 days (exact dates unknown) on shore prior to joining the vessel in Port Fourchon, Louisiana. This training included specific instruction about line handling, the Goal Zero Moxie Media videos, which he completed, and was issued a *Certificate of Completion for Line Handling Safety for the Inland Waterways*, dated October 5, 2021. This training was completed by Wiper Price and the certificate issued prior to his joining the vessel about 4-weeks before his line handling injury occurred.

Wiper Price had been working onboard for about 3 weeks conducting tasks assigned by the chief engineer when he was assigned to assist Captain Mathes to adjust the bow lines, a two-person task. According to Captain Mathes, Deckhand Tyva Dubose was off-duty and asleep, so he called to the engine room for assistance. Chief Engineer Frankie Scott took the call, he was working with subcontractors and instructed Wiper Price to meet with the captain and assist him as required.

Wiper Price met the captain on the bridge, had some discussion of what needed to be done, and they attended to the foredeck where the mooring windlass is located (**Figure 2**).



**Figure 2: LANEY CHOUEST foredeck and windlass. Image from Plaintiff's vessel inspection.**

Captain Mathes described in his testimony on pages 154 and 155 that the port bow line assigned to Mr. Price was taut and the starboard bow line being managed by himself was slack. He advised Mr. Price that he intended to provide him some slack (using the winch) but described that Mr. Price prematurely flipped a turn off the warping drum thus allowing the line, under significant tension, to slip on the warping drum. The recoil of the line then engaged Mr. Price causing his injuries. The exact manner in which Wiper Price was injured is unclear from the testimony and written reports. He could have been pulled into the warping drum while surging the line or as he attempted to remove a wrap off the drum, he lost control of the line. In either case it resulted in his personal injury.

One plausible scenario as described by Captain Mathes in his testimony is:

*Page 154*
*A. And this line was tight and I told him, hold on. I will give you some slack. Before I could give him the slack, he flipped the line, the port line, off of the end of the drum. When he did, all of that line came back and hit him. It was five wraps of line on that drum. It's only four there. When he did, it came back and it hit him and that was it. All the stored energy in the rope from the port line was really tight. 6,000 tons of boat holding against it, and it came back and hit him.*

The Galliano Marine Service, Incident Report, OS Layton Price Injury, Report No. 216/2021/018, dated October 20, 2021 states the following:

**Description (What Happened?)**
*The vessel was moored starboard side at the dockside of the Northern Expansion area located in Port Fourchon. It was noted by the vessel Master that the bow mooring lines needed to be tightened. The Master and the Ordinary Seaman (OS) proceeded to the bow area with the intention of tightening the mooring lines. The Master positioned himself at the starboard windlass controls, winching in. The OS placed himself to the left rear of the port capstan and began removing the lines from the port side bits. The OS noticed that the port lines were not loosening. He grabbed the excess portion of the line approximately 3' from the capstan, with both hands spaced apart from each other. The OS used a whipping motion in an attempt to free the line. When doing so, the stored energy within the four to five wraps still on the capstan was released and the mooring line began to "bird nest", while the OS was still holding the line. The released energy jerked the OS into the windlass, injuring his right thumb, arm, and shoulder.*

**Describe Cause(s) (Why did it happen?)**
*IP manually handled the mooring line and the stored energy jerked the OS into the windlass.*

**Immediate Causes**
*Disregard for Policies & Procedures*
*Communication Failure*
*Lack of Training*

**Tell me the story of what happened:**
*While adjusting the mooring lines on the bow, Layton was manually releasing the line from the port side of the anchor windlass capstan. When doing so, the stored energy within the line was released and the mooring line began to "bird nest", while Layton was still holding the line. The released energy jerked him forward, causing his right hand to make contact with the windlass, his thumbnail was ruptured and bleeding. He immediately was saying his arm was hurting very badly and he was saying that his arm was broke. I contacted ECO and requested Medical attention for him and the C-Port Medic arrived and transported him to the hospital to be checked out.*

**Section 11:**
*Assisting the captain to tighten the mooring lines with the windlass on the bow. Layton manually released the line on the port side capstan when the line would not slide as desired.*

*Layton should have waited for instruction from the captain to manually adjust. Adjustment should have been made with the windlass controls, not manually.*

It is clear from the review of this matter that Wiper Price was not operating the windlass at the time of the incident. His assigned task was to tend the mooring line in use on the port side of the windlass under the direction of Captain Mathes. This required minimal training as he was not required to operate the winch nor to make any judgement about how much line to heave-in or pay-out. This was the master's responsibility as described by Captain Mathes. Respecting that Wiper Price was a new employee on this vessel and designated as a Short Service Employee, it would be expected that he would have approached the assigned task with caution, have carefully followed the master's instructions or instead clearly state to Captain Mathes that he was unfamiliar and unsure of what to do. Captain Mathes should have recognized Wiper Price's Short Service Employee status and ensured Wiper Price knew what to do. There was ample time for Captain Mathes to provide several minutes of instruction to Wiper Price had he (Price) identified any personal concern about performing the subject line handling correctly and safely to his captain.

## Analysis

**The inherent dangers related to onboard line handling, including mooring lines, are common across all types of vessels.** The Plaintiff's expert, 3D Marine, has correctly noted in their report that capstans (vertical shaft) and warping drums (horizontal shaft) require different techniques to manage the lines when in use; however, the principals of construction, use, and associated dangers are the same. A line is heaved-in using multiple "wraps" on the drum to gain friction. The mechanical advantage offered by the gears and drive motor (typically electric or hydraulic) provides the pulling force to tension the line. **Figure 3 and Figure 4** demonstrate the different configuration of capstans and warping drums. Note that the horizontally-mounted warping drum may sometimes be called a gypsy-head, winch drum, or drum end.



**Figure 3: Typical deck mounted (electric) capstan, note vertical configuration (internet photograph).**



**Figure 4: Large deck winch with horizontal warping drum (internet photograph).**

In either case of a warping drum or capstan, the techniques to use the device are the same and this is true regardless of the size. A heavily loaded 3/4" diameter line on a fishing vessel winch requires the same respect as does an 8-inch circumference mooring line on an OSV.

Wiper Price should have understood from his experience and training that a loaded line wrapped on the capstan or winch on any vessel demands the same respect.

**It is an acceptable practice for LANEY CHOUEST to leave her bow lines on the warping drums.** Notable in Figure 3 above is that the mooring line remains wrapped on the warping drum and then secured to the mooring bitts on the deck. Captain Scruton has opined that this is not the best practice but there are many occasions and circumstances where this is the better choice, subject to the particular vessel operations, mooring location, crew compliment, and other factors, such as tidal range, cargo loading/discharge and even local port requirements concerning vessel readiness and necessity to constantly tension mooring lines such as at oil terminals.

The use of a stopper to transfer the mooring line to the bitts is a common practice if the bitts are located before the windlass or capstan. **Figure 5** is an internet sketch depicting the correct use of a stopper. The stopper temporarily holds the tension on the line whilst the line is transferred to the bitts or vice-versa from the bitts to the warping-drum. In the figure below, the drawing appears to show a padeye at the base of the bitts, customarily, the stopper is affixed to the padeye but is just as effective as shown in the drawing.




**Figure 5: Typical and correct use of a mooring line stopper.**

For the LANEY CHOUEST, there are several reasons to leave the mooring lines on the warping drums while dockside:

- Short staff crew during the refit period.
- Only using two head-lines at this location (Did not require multiple head-lines).
- Necessity to adjust lines on a frequent basis.
- Foredeck roller fairleads and bitts are positioned to align with the warping drums.
- No provision on the LANEY CHOUEST foredeck to use stoppers in front of the warping-drums.
- Many mooring bitts have a ring or padeye fitted for this purpose, there are none on LANEY CHOUEST.
- Using a stopper immediately forward of the bitts does not allow the wraps to be removed from the warping-drum which would still be under tension.
- Using a "long" stopper to stop the mooring line ahead of the warping-drum would be a dangerous practice.

Wiper Price testified that he was familiar with tension on lines with multiple turns on a vertical capstan from his fishing vessel experience. On page 187of his deposition, he responded:

*Q. Had you ever before that day been involved in using a winch where someone asked you to let some slack out of a line?*
*A. Yeah.*

When asked how many times:

*A. About a dozen or more.*
*Q. Dozen or more. And who were you working with when those occurred?*
*A. Westbank Fisheries.*
*Q. Okay. And what sort of winches were you working with? Was that all the tugger winch?*
*A. Same thing, on a smaller scale.*

The same principals apply to any drum-type line handling device in regard to not letting the line slip and/or to not flip a turn off the drum without being prepared for the action of the line. In either situation of capstan or warping-drum, the stored energy of the line could have significant and adverse consequences to the line handler.

3D Marine's comparison that Wiper Price had not previously worked with a horizontal warping drum as a contributing factor to this incident is moot when considering the apparent tension on the mooring line, the larger dimensional sizes of the gear, and recognizable multiple turns of line on the horizontal drum in the same manner as is done on a vertical capstan. Wiper Price could not have missed observing the open and obvious large sizes of the LANEY CHOUEST ropes and winch. He should have, but failed to have, more respect for the task at hand. Instead, he states in his testimony that he advised Captain Mathes of his inexperience but then contradicts his own concerns by stating he had no safety concerns. On page 191, the deposition discussion was as follows:

> Q. I'm asking did you feel at any point when he gave that instruction, that was an unsafe request of him?
> A. No.
> Q. Okay. If you had, you would have used stop work authority. Correct?
> A. I didn't feel unsafe enough to use stop work or whatever you said.

Later in his testimony, on page 195 Wiper Price reinforced that he felt confident to assist the captain on October 30, 2021:

> A. I felt like he had enough training that he could make the calls to -- I'm competent enough to listen to a captain. You make the calls. I feel safe with you.
> A. That is my answer to that.
> Q. I'm just asking if you could tell me whether or not you ever told the captain that you felt like you were not trained enough to do that?
> A. No.

**Wiper Price was a professional seaman with line handling knowledge and experience.** 3D Marine has offered in their expert report that Wiper Price' prior vessel experience on fishing vessels is not commensurate with working on an OSV; specifically, the mooring activities onboard LANEY CHOUEST. Captain Scruton stated in his report:

> *Prior to working for Galliano, Mr. Layton Price had primarily worked in the fishing industry for Daybrook Fisheries and Westbank Fisheries, and while he had previously handled lines on pogie boats (sometimes called pogy boats), the winches and ropes were considerably smaller than those on the MV LANEY CHOUEST. (Price deposition pages 48, 49, 50, 187, 188, 226 and 227).*

Accepting that Wiper Price's prior line handling experience was with smaller lines and equipment on commercial fishing vessels, the same safety concepts translate seamlessly to the

larger OSV size equipment. It is an obvious and a generally accepted notion that the larger the hardware, the greater the risk. A portion of Wiper Price's testimony covered his fishing vessel experience wherein he acknowledged he had been trained and understood the risks associated with the work. On multiple pages of his testimony, he described his past experiences, all of which would be applicable to the dangers of working on an OSV as he advanced up to larger vessels on his career path.

*Page 60 A. It was just dangerous working on the purse boats.*

Further on page 72 he testified:

*Q. Okay. Have you ever seen a winch cable under tension while working for Daybrook Fisheries?*
*A. Yes, sir.*

And then on page 73 he identified his specific training as a rigger:

*Q. So you were acting as an AB deckhand/rigger? Did you have a rigger certification while working with Kilgore?*
*A. Yes, sir.*
*Q. When did you get that?*
*A. Hiring process.*
*Q. At Kilgore?*
*A. Yes, sir.*
*Q. Okay. So you became rigger certified before you started working your 50-plus days with Kilgore. Correct?*
*A. Yes, sir.*

On page 78 and then page 79:

*Q. Okay. Now, would the vessel use its engines to get tied to the dock?*
*A. Yes, sir.*
*Q. And during that process you had to be mindful of the stresses that were being put on the dock lines. Correct?*
*A. Yes, sir.*
*Q. Okay. And you are aware during your time that stress on the line can be potentially a dangerous issue. Correct?*
*A. Yes Sir*

*Q. Okay. And you are aware that when a line is being used to moor a vessel, either with a winch or with the vessel's engines, that the line can be under some tension and handling that line can be dangerous. Correct?*
*A. Yes.*

Wiper Price testified that he had experience with powered capstans on other vessels. This included the fishing operations, rigging to hoist gear onboard, and line handling. Upon being presented with the OSV size equipment, and having recently viewed the line handling training videos less than four weeks previously, there is no reason that Wiper Price should not have had the necessary respect for the dangers of working with the larger mooring equipment with Captain Mathes on October 30, 2021.

Wiper Price testified (eight months after the incident) that he did not understand how to do the task and had advised Captain Mathes of the same, yet he attended to the foredeck with the captain and proceeded to do the task. Wiper Price apparently had the confidence to work with the captain and described in his deposition that he trusted the captains experience on October 30, 2021.

While some of the above comments are contradictory, it is S-E-A's opinion that Wiper Price had the required training and experience to assist Captain Mathes on October 30, 2021.

**The LANEY CHOUEST foredeck arrangement and mooring appurtenances were of an approved design and installation commensurate with the applicable standards and contemporary OSV designs.** Observation of the available photographs and documentation about the vessel indicates the foredeck and foredeck mooring arrangements are typical of a large U.S. flag OSV. To build the vessel, Edison Chouest would have submitted the vessel plans to the United States Coast Guard for plan review/approval and the plans would also have been submitted to the classification society American Bureau of Shipping for the same reasons. There is no need to detail the approval process in this discussion, but it is sufficient to state that LANEY CHOUEST was constructed to the applicable standards of the USCG and ABS then certified for use by those bodies accordingly. The foredeck mooring arrangement would have been part of the plan review, approval, and certification process.

**Two persons could have safely performed the tensioning of the LANEY CHOUEST bow lines on October 30, 2021.** Captain Mathes and Deckhand Dubose both testified that the intended adjusting of the bow mooring lines could have been done with only two persons.

Deckhand Dubose testified on pages 63 and 65 that:

> *A. Okay. Well, adjusting the mooring lines, you just need two people for that, because if you were adjusting one line, then you were only adjusting one side.*
> *Page 65*
> *Q. Now, what about if you have to adjust both mooring lines? How many crewmembers does it take?*
> *A. I believe it requires the same amount because we're just doing -- we can basically do the same thing, just do it one at a time from my experience.*

Captain Mathes testified on page 105 of his deposition:

> *A. Of course it would be -- I mean one person operating the windlass and one on each rope. It would be better, but we do it all the time with two.*

S-E-A is in agreement with the above testimony that it would be safe to perform this operation with two persons instead of three.

**Galliano Marine Services pre-employment training, company safety policies, and onboard procedures are commensurate with industry standards.** It is apparent that a contributing cause of the subject incident onboard the LANEY CHOUEST on the morning of October 30, 2021, was a disregard for certain company policies and procedures by Captain Mathes and Wiper Price. The circumstances and reasons the captain failed to follow the company policies explicitly are not excusable but explained further in this report. In the same context, Wiper Price, an experienced mariner and having completed his company specific training just prior to joining the vessel 3-weeks earlier, also had a duty to follow the appliable safety guidelines and company policies. His failure to do so, therefore, also was a contributing cause of his injuries.

**Captain Mathes made a logical presumption that Wiper Price knew how to handle mooring lines.** It is not unusual for the engineering staff of a workboat to participate in line handling when and as required. The workboat fleet, including OSV's like the LANEY CHOUEST, typically operate with a basic crew compliment to stand the required watches while underway and to perform the mission specific tasks such as oilfield cargo operations, dive support, surveying, personnel and equipment transport, or other tasks such as wellhead maintenance and pipeline work.

Traditionally the deck crew pilot the vessel and tend to the deck operations, and the engineering staff are responsible for the engine room machinery and auxiliary equipment. Certain tasks, such as mooring and unmooring of larger vessels like the LANEY CHOUEST (105 meters / 344 feet) require most or all of the crew to participate in the mooring operations hence it would be customary for the captain to call upon the engineering staff to assist mooring the vessel. When a vessel is warm stacked, all hands would be available if the captain considered it necessary. In this matter, Captain Mathes made his decision that only one assistant was needed to reset the bow lines to his satisfaction.

As stated previously in this report, if Wiper Price either felt he did not have the experience or knowledge to safely participate in the mooring procedure, or if he required additional assistance, he should have advised Captain Mathes prior to attempting the line handling.

**As a professional mariner with many years' experiences with different companies, Wiper Price should have understood the concept of risk assessment even if he did not use the correct terminology.** Notable is that Wiper Price stated in his testimony he did not know the term *Risk Assessment*. It would be immaterial if he knew that exact phrase so long as he understood the concept. It would be logical that during the reported three or four days of pre-employment training that this term was repeated many times during classroom discussions that typically emphasize the Stop-Work Authority and Job Safety Analysis. In this matter, Wiper Price was assigned to the vessel and received the appropriate company training immediately prior to signing onboard (about three weeks prior). With that training, he was made aware of these concepts that have been at the forefront of the marine industries for more than several decades.

Captain Scruton of 3D Marine offers comments about this topic in his report wherein he describes that if Wiper Price did not understand the risk, then he would have no reason to call a Stop-Work order when on the foredeck with Captain Mathes. The fact remains that Galliano Marine Services, in accordance with the OSV industry best practices, provided Wiper Price several days of classroom training prior to his assignment to the LANEY CHOUEST. Notwithstanding he was an experienced seaman on other vessels prior to being hired by Galliano Marine Services, Wiper Price may have failed to use the training opportunity to learn about the risks and hazards of the oilfield industry that he was about to enter. When

questioned about the company safety training; specifically, about line handling, Wiper Price responded on page 226 of his testimony:

> Q. At any point in time did Galliano Marine Services provide you any training in line handling?
> A. They had some videos on it, nobody paid attention to.

The above response by Wiper Price would indicate that he had confidence in his skills as a mariner or did not understand the safety culture necessary to be working in the oilfield environment.

**Regardless of when Wiper Price received his pre-employment training, there was no reason for Captain Mathes to specifically question if Wiper Price had received the company training.** Wiper Price was assigned to the vessel, which would only have been done after the initial shoreside company training was complete. The training included the dangers about line handling, the stop work authority, and risk assessment.

How and why, Wiper Price did not practice what he was taught (or should have learned) during the company training is the open question in this matter. Galliano Marine Services hired an employee with maritime experience that included working on commercial fishing vessels, a job that in many ways is more dangerous than working on an OSV. The company has a standing policy that hired employees undergo shore-side safety training prior to assignment on a company vessel and the proper procedures were followed. Wiper Price testified he attended the training (but apparently did not pay full attention at all times) and voluntarily accepted the berth onboard and the subsequent assignment to assist Captain Mathes with the line handling on October 30, 2021.

When an employee arrives who has maritime experience, has been through the company required training program, and agrees to do a routine task, there is no reason that Captain Mathes should have questioned Wiper Price's ability to do the job with him.

**A Job Safety Analysis and/or Risk Assessment was not specifically necessary for this task.** Typically, it is not necessary to conduct a Job Safety Analysis for routine tasks like adjusting mooring lines unless there is an anticipation that something is out of the ordinary, has an apparent higher risk or other exceptional concern. The Galliano Marine Services operating

procedures included the option for Captain Mathes to conduct a JSA prior to the line handling operation or, at the very least, a "tool box" meeting to ensure those participating understood what to do and how to do it.

Captain Mathes requested assistance from the engine room to perform what he considered to be an everyday and routine dockside task, to adjust the mooring lines that had become slack. He did not conduct a JSA before the mooring operation because of his understanding that Wiper Price knew what to do. This was based upon Wiper Price' own comments to the Captain just prior to incident. On page 149 of his deposition, Captain Mathes described the briefing that he had with Wiper Price before the line handling commenced:

*Q. You would agree with me that you all did not discuss what you were about to do prior to performing the task?*
*A. We discussed for a minute. I just said we were going to tighten the bow lines up.*
*Q. Did you tell him --*
*A. He seemed to understand. He knew, you know. He said he understood what we had to do.*
*Q. So I'm not trying to be difficult with you, Captain, but I got to really get into that. Where were you when you said, we are going to tighten the bow line?*
*A. Wheelhouse.*
*Q. Was Layton Price in the wheelhouse with you?*
*A. Yes*

The above exchange occurred in October of 2021, and the captain's deposition was in September of 2022. Recalling their exact words would be difficult for anyone but it is sufficient to state that Captain Mathes appears to have had no concerns that he and Wiper Price could adjust the mooring lines together. They did have a brief meeting before the task that could be construed as a tool-box briefing. Dependent upon the task, a tool-box briefing may require only a quick exchange between the parties present or a comprehensive five-minute discussion about certain safety concerns or procedures. It is up to those persons present to determine how much time and how in-depth the meeting needs to be.

Wiper Price has since stated in his deposition in June of 2022 that no formal discussion occurred but instead, he told the captain he had concerns about doing this task. The deposition citations entered above in this report contradict Wiper Price's own allegations of what transpired along with his own lack of concern immediately prior to the mooring line incident onboard LANEY CHOUEST.

Regarding the lack of a JSA, when questioned about the post incident Galliano Marine Incident Report, Captain Mathes testified on page 166 as follows:

> *Q. It says, "Immediate causes. Disregard for policies and procedures." Do you know any policies and procedures that were disregarded?*
> *A. Well, we didn't take the time to talk about it as much as we should have.*

Galliano Marine Services QHSE Coordinator Hal Nini offered in his testimony on page 56 that Captain Mathes and Wiper Price failed to follow the company policies:

> *Q. Do you believe that captain Mathes disregarded policies and procedures prior to this incident occurring?*
> *A. I believe that both did not follow policies and procedures in this occurring.*
> *Q. You would agree with me that Captain Mathes has the ultimate work authority on the LANEY CHOUEST if he's on watch?*
> *A. I agree that Captain Mathes is the master of the vessel and he's responsible for maintaining a safe culture of the vessel, to the best of his abilities, and every mariner on board, even when I walk on board, we all have responsibility to safety -- to ourselves and those around us and any process and procedure. And as far as process and procedure were concerned, there may be some fault on the captain. There is, but also Mr. Price had a responsibility, according to our policies and procedures, to call a stop work authority if he was unaware, unsure of, or uncomfortable about any of the processes that were going on.*

The JSA concept is well accepted within the maritime (and land-based) industries but often can be used so much that the purpose of the JSA is truly lost in the paperwork. JSA fatigue from overuse of the concept is real and often causes a lax attitude instead of the expected heightened safety awareness it is intended to provide.

**Non deck department crewmembers on OSV's may sometimes be required to assist with line handling.** This is a skill that all seamen engaged in the workboat industry must have as there are oftentimes situations that require many hands to assist mooring and unmooring the vessel. Short crew numbers, high winds, current, lack of maneuvering room may all offer conditions where the deck hands alone are not capable of safely conducting the mooring operations. This is especially true on the contemporary generation of 300+ foot vessels with high freeboard and large displacements. All staff on OSV's should be and typically are trained in line handling.

HSQE Coordinator Hal Nini described this on page 62 of his testimony:

> *Q. Okay, do you agree with me that mooring operations is really a task performed by the deck crew. Do you agree with that?*
> *A. I do, but every man upon hire, they go through proper mooring. Mooring is a fleet wide and so from time-to-time engine crewmembers are called up to handle mooring lines to help out AB's, OS's or what have you. And so he was definitely trained and he was aware of the hazards in dealing with mooring lines, staying out of the way of line of fire and those things on lines that hold tension. So he was well aware of that and he had that training prior to being put on to a vessel.*

On pages 73 and 74 of Deckhand Dubose' deposition, he described that it is not "rare" for the engineering crew to participate in the vessel mooring operations.

> *A. No. I believe it's also in their responsibility. I think mooring the boat is one of the jobs of the whole crew.*
> *A. Well, a few of the times was with the chief engineer.*
> *Q. That's Scott Johnson?*
> *A. Yes.*
> *Q. And who were the other times?*
> *A. And Mr. Price is his name. I seen him tie the lines a couple times as well.*
> Q. All right. How many times have you witnessed Mr. Price use the windlass winch to adjust the mooring lines prior to October 30, 2021?
> A. Maybe like twice.
> Q. And who was he working with when he did that?
> A. He was working with me at the time. I believe we was tying the boat up.

It should be included in this discussion that Captain Mathes did conduct a Risk Assessment on October 20, 2021, onboard LANEY CHOUEST that included himself, Wiper Price, the vessel Engineer, QMED, Ordinary Seaman, another Wiper and two Riggers. The subject and title of the Risk Assessment was MOORING/UNMOORING and included both deck and engineering staff who would or could be involved in mooring the vessel. This meeting was held 10 days before wiper Price's mooring line incident.

It is an acceptable practice to have engineering staff, such as Wiper Price, to handle mooring lines regardless if the vessel is in full operational mode or warm stacked as it was on October 30, 2021.

## Summary

**Many of the allegations in this matter are not relevant to the subject incident.** The Complaints filed in this matter claim the Defendant was careless and negligent, and breached the duty owed to its employee as follows:

*a. In failing to provide a safe work environment;*
*b. In failing to provide adequate safety equipment and gear;*
*c. In failing to properly inspect and maintain the vessel, its equipment and gear, in safe, working condition;*
*d. In operating the vessel in an unsafe and improper manner; and,*
*e. Other acts of negligence as proven at time of trial.*

Of the above, the Plaintiff has offered no specific proof the work environment was not safe but have identified (and S-E-A agrees) the subject line handling operation was likely performed improperly. Regarding the other allegations, no details have been provided about inadequate safety equipment, gear, any failure to inspect or maintain the vessel or otherwise operating in an unsafe and improper manner (notwithstanding the subject incident). The company post-incident investigation identified none of these other alleged faults.

The Complaints also include that LANEY CHOUEST was Unseaworthy in the following particulars:

*a. The vessel had an incompetent Master, pilot, and/or crew;*
*b. There was a malfunction of some of the equipment on deck used for mooring;*
*c. The vessel lacked adequate safety equipment and gear to protect the crew; and,*
*d. Other unseaworthy conditions as proven at the time of trial.*

S-E-A has stated in this report that Captain Mathes could have and should have followed company procedures and protocols more closely on October 30, 2021 with Wiper Price. His failure to do so may be described as incompetent but in more general terms he simply ignored the proper procedure for this task. There was no reported malfunction of the mooring equipment, there was no reported lack of safety equipment or protective gear for the crew, and no other unseaworthy conditions about the vessel that contributed to the subject incident. The company post-incident investigation identified none of these other alleged faults.

**Galliano Marine Services had the appropriate company procedures, shoreside pre-employment training, and onboard practices that should have prevented the personal injury of Wiper Price.** Captain Mathes and Wiper Price simply did not follow the company procedures,

nor did they use their own experiences and knowledge about the dangers of working with mooring lines on October 30, 2021.

While Captain Mathes assumed Wiper Price understood what to do, it was Wiper Price who accepted the task, failed to ask his supervisor (Captain Mathes) for better instruction, and failed to use the Stop-Work Authority before placing his hands on the subject mooring line.

**The preponderance of fault in this matter lies upon Wiper Price.** By taking the line in his hands, this action indicated to Captain Mathes that he knew what to do and would handle the mooring line as expected. By not clearly stating to Captain Mathes that he was unsure or unfamiliar with what to do, Captain Mathes could only assume that Wiper Price was capable and competent with line handling. Either of the above actions were out of the direct control of the vessels manager, Galliano Marine Services.

If the above two statements are determined to be false, the only remaining explanation of how Wiper Price became injured is that he failed to follow his experience and training. He made a mistake in the manner that he attempted to control the subject mooring line.

## Professional Qualifications

Captain Karentz is a professional mariner with credentials issued by the USCG as Master, Unlimited Tonnage Upon Oceans. In addition to the more than 40 years training, education, and background listed on the undersigned's Curriculum Vitae that is attached to this report, his maritime career has included being the person in charge of countless mooring operations, he has trained seafarers in safe line-handling procedures and has authored and published safety policies for vessel owners related to safe line handling on ships and workboats. In addition, Captain Karentz has investigated numerous mooring related incidents that resulted in personal injuries. Captain Karentz has been qualified in both State and Federal courts to testify in areas of expertise including but not limited to marine navigation, vessel operations, crewing, management, vessel cargo and charter operations. His background as a maritime expert and investigator includes analysis of collisions, allisions, foundered vessels and other marine related incidents in both the commercial and recreational boating arenas.

# Appendices

## Investigator Credentials

1. Investigator CV
2. Investigator Testimony Log
3. Investigator Billable Rate Disclosure